UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-21927-CIV-ALTMAN/Goodman

YVETTE HARRELL,

    *Plaintiff,*

*v.*

CITY OF OPA-LOCKA,

    *Defendant.*

_____/

**<u>ORDER</u>**

Over the last few years, the City of Opa Locka—dealing with financial hardship and a not-insubstantial degree of political controversy—has cycled through several City managers. One of these was our Plaintiff, Yvette Harrell, who occupied the role twice. Her first stint lasted just a year: from June 2016, when she was unexpectedly promoted into the role, to July 2017, when she resigned. Her second stint was even shorter: It began on October 4, 2018, after the City fired a male manager and brought her in to replace him, and it ended on December 12, 2018—when a newly-installed, five-member Commission voted 3-to-2 to fire her. The three commissioners who voted to remove Harrell explained their reasoning at a regular (and public) meeting of the City Commission—and their comments were recorded. As relevant here, they described her as "reactionary," "ineffective," and "inefficient"; they cited her lack of experience in handling the City's operations and infrastructure; and they observed that employee morale was at an "all-time low"—in large part because they'd heard from employees who feared Harrell's retribution. Harrell, who was present at the meeting, never disputed any of this—nor did she suggest that she was fired *because of* her sex. Months later, though, with the help of a lawyer, she changed her tune. Now, she claims—without any evidence—that she was *actually*

fired because she's a woman. Since no reasonable jury would agree with her, we **GRANT** the City's Motion for Summary Judgment [ECF No. 46] (the "MSJ").

### HARRELL'S VIOLATION OF LOCAL RULE 56.1

Unfortunately, we begin with some technical improprieties. As the City rightly points out, Harrell's opposition brief—formally, Harrell's Memorandum of Law in Opposition to the City's Motion for Summary Judgment [ECF No. 53] ("Harrell's Response")—"fails to comply with this Court's Local Rule 56.1 and FED. R. CIV. P. 56, generally." *See* The City's Reply in Support of Motion for Summary Judgment [ECF No. 54] (the "Reply") at 1.

We agree that Harrell has violated Local Rule 56.1 in four main ways. *First*, Harrell didn't file and serve a *separate and contemporaneous* Statement of Material Facts, as multiple provisions of Local Rule 56.1 plainly require. *See, e.g.*, S.D. FLA. L.R. 56.1(a)(1) ("A motion for summary judgment and the opposition to it shall each be accompanied by a separate and contemporaneously filed and served Statement of Material Facts."); S.D. FLA. L.R. 56.1(b)(1) ("All Statements of Material Facts (whether filed by the movant or opponent) shall be filed and served as separate documents and not as exhibits or attachments."). Instead, she embedded her facts *within* her Response. *See* Response at 2–4 (containing a section titled "Statement of Undisputed Facts").

*Second*, Harrell didn't organize her "facts" to "correspond with the order and paragraph numbering format used by the movant." S.D. FLA. L.R. 56.1(b)(2)(a). She just used her own format, which makes it impossible for us to determine which of the City's facts she's disputing and which she's conceding. *Cf. Reese v. Herbert*, 527 F.3d 1253, 1268 (11th Cir. 2008) ("Specifically, Local Rule 56.1 protects judicial resources by making the parties organize the evidence rather than leaving the burden upon the district judge.").

*Third*, she didn't "clearly challenge any purportedly material fact asserted by the movant," S.D. FLA. L.R. 56.1(a)(2), by using, "as the very first word in each paragraph-by-paragraph response, the

word 'disputed' or 'undisputed,'" S.D. FLA. L.R. 56.1(b)(2)(B). She just outlined her own facts without properly identifying them as "'additional facts' that [she] contends are material to the motion for summary judgment[.]" S.D. FLA. L.R. 56.1(b)(2)(D); *see also Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1302 (11th Cir. 2009) ("Where the party responding to a summary judgment motion does not directly refute a material fact set forth in the movant's Statement of Material Facts with specific citations to evidence, or otherwise fails to state a valid objection to the material fact pursuant to Local Rule 56.1B(2), such fact is deemed admitted by respondent.").

*Fourth*, Harrell's "facts" aren't, as they must be, "supported by specific, pinpoint references to particular parts of record material." S.D. FLA. L.R. 56.1(b)(1)(B) (cleaned up); *see also* FED. R. CIV. P. 56(c)(1) ("A party asserting that a fact cannot be or is genuinely disputed *must* support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits, or declarations, stipulations, admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." (emphasis added & cleaned up)). In the three pages of "facts" she buried in her Response, Harrell included only three "general citations to exhibits without a page number or pincite." S.D. FLA. L.R. 56.1(b)(1)(B) (cleaned up). As a result, the City understandably "cannot even attempt to draft a reply statement of facts because it is unclear what Harrell is trying to factually assert." Reply at 4 n.2.

As redress, the City asks us to "deem[ ] admitted" all of the facts it advanced in its Statement of Undisputed Material Facts [ECF No. 47] (the "City's SOF"). Reply at 4. And that's precisely what we did in a recent case that presented many of the same violations we have here. *See Thompson v. Wal-Mart Stores E., L.P.*, 2022 WL 59678, at *1 (S.D. Fla. Jan. 6, 2022) (Altman, J.). In *Thompson*, we noted that "[a]ll material facts in any party's Statement of Material Facts may be deemed admitted unless controverted by the other party's Statement of Material Facts, provided that: (i) the Court finds that

the material fact at issue is supported by properly cited record evidence; and (ii) any exception under FED. R. CIV. P. 56 does not apply." *Id.* (quoting S.D. FLA. L.R. 56.1(c)). Given that the plaintiff in that case hadn't controverted any of the defendant's factual assertions—and because those assertions were properly supported by record evidence—we "deemed them admitted[.]" *Id.* (cleaned up). Our case is very similar. Harrell hasn't controverted any of the City's factual averments, and those averments appear to be properly supported by the record evidence. *See generally* City's SOF. As in *Thompson*, then, we'll "deem admitted" every properly supported fact the City asserted in its SOF. *See Thompson*, 2022 WL 59678, at *1; *see also Joseph v. Napolitano*, 839 F. Supp. 2d 1324, 1328–30 (S.D. Fla. 2012) (Goodman, Mag. J.) ("Because Plaintiff did not contradict Defendant's statement of undisputed material facts and because Defendant's statements are supported by evidence in the record, the facts alleged in the Defendant's statement are *deemed admitted*.").

The City also asks us to strike Harrell's "purported summary judgment evidence," Reply at 4—a request we denied in *Thompson* for two reasons: (1) "some of Thompson's factual averments were properly supported by record evidence—even though they were presented in an improper format"; and (2) trial in that case was "around the corner," so we didn't "have the time to do what we otherwise might have done: strike Thompson's Response Statement of Facts and order her to submit a new one," *Thompson*, 2022 WL 59678, at *1 (cleaned up) (citing S.D. FLA. L.R. 56.1(d) and observing that the Court "may"—but need not—strike a non-conforming statement of material facts). Here, too, trial is just a few weeks away, and *some*—albeit very (very) few—of Harrell's "facts" are supported by the record. So, as in *Thompson*, we won't strike all of Harrell's evidence. Still, as we're about to see, this really is a pyrrhic victory for Harrell, who's adduced precious little evidence to support her claims.

THE FACTS[1]

## A.  June 2016–July 2017: Harrell's first stint as City Manager

"The City Clerk, City Attorney, and City Manager are the three positions that directly report to and *serve at the pleasure of* the City Commission." Letter dated December 12, 2018, from the Office of the Governor [ECF No. 47-7] (the "Governor's Letter") at 2 n.4 (emphasis added); *see also* Harrell's Response (not disputing this point).

On June 9, 2016, when Harrell first stepped in as City Manager, "the City was on the verge of bankruptcy." City's SOF ¶¶ 3, 7; Harrell's Response (not disputing this point). Just eight days earlier, on June 1, 2016, Florida's then-Governor, Rick Scott, had issued an executive order "declaring the City to be in a state of financial emergency," and he'd appointed a "state oversight board" to monitor the City's finances. City's SOF ¶¶ 2–3; Harrell's Response (not disputing this point). It was, in Harrell's own words, "a financially chaotic and uncertain time" when "insolvency of the City was considered." Harrell's Response at 2. "Plaintiff Harrell is a female." *Id.* at 2.

It was in this context that Harrell first interacted with Joseph Kelley, who was a "City Commissioner when Harrell was appointed acting City Manager . . . through the time that Harrell voluntarily resigned from the City on or around July 27, 2017." Declaration of Joseph Kelley [ECF No. 47-1] ("Kelley Decl.") ¶ 7. Kelley wasn't kind to Harrell, as Harrell explained in this January 12, 2017 email:

> [City Attorney] Mr. [Vincent] Brown and Ms. [Kierra] Ward:
>
> As the City has no specific manner for me to address the following concern, I have chosen to address you both directly.

---

[1] "The facts are described in the light most favorable to [the plaintiff]." *Plott v. NCL Am., LLC*, 786 F. App'x 199, 201 (11th Cir. 2019); *see also Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002) ("[F]or summary judgment purposes, our analysis must begin with a description of the facts in the light most favorable to the [non-movant].").

Since becoming the City Manager (both acting and permanent), I have endured consistent and persistent public ridicule along with statements and actions purposed to humiliate and belittle me on many occasions from Vice Mayor Joseph L. Kelley.

Vice Mayor Kelley has made demeaning and offensive comments to me in public meetings. In that same forum and others, he has directly and indirectly accused me of actions committed by former City Managers and employees, he has sought to undermine my authority with City employees and has blatantly lied about my responsiveness with respect to his requests.

Although there are several incidents, all of which I have evidence and witnesses to corroborate, the last and final incident took place last evening wherein after the Commission meeting, the Vice Mayor began to yell and gesture at me in front of City staff and members of the Public. He went on a tirade about wanting the "same treatment as the Mayor," while I stood there embarrassed and once again humiliated. I endured the treatment in part because I didn't want to respond in kind, but also in part because I didn't want to escalate the mistreatment by the Vice Mayor.

After careful consideration, however, I have decided that I have had enough. No matter what may result from this notice, I will no longer endure the constant public humiliation and ridicule, all in an effort to garner for future votes and accolades. I will no longer allow the fact that *I am female* and not his "choice" for City Manager to be an accepted reason for mistreatment and harassment. I will no longer subject myself to the demeaning culture of the City of Opa-Locka, which has been that some elected officials are allowed to behave in abusive manners with reckless regard for decency and professionalism (and the law), simply because they were elected. I will no longer allow the concern of reprisal to prevent me from making a complaint and taking a stand.

Vice Mayor Kelley has created a hostile work environment for me through his varied actions, including undermining my authority by circumventing me and giving directives to staff directly, sometimes in contradiction of my directives, but at all times in contradiction of the City's charter and continuously belittling and demeaning me, in writing and verbally, in private and in public. His actions have made it difficult, and in some cases impossible, for me to perform my duties as City Manager and I will no longer function under these circumstances. This situation has continued for far too long, without an inkling of any progression towards adjustment or corrective behavior. As a result, I am formally placing the City on notice thereof. I will not detail any other incidents in light of likelihood of litigation, but consider the foregoing my first, formal and only notice.

Kindest regards,

Yvette J. Harrell, Esq.
City Manager

E-mail from Yvette Harrell, City Manager of Opa Locka, to Vincent Brown, City Attorney of Opa Locka, and Kierra Ward, City of Opa Locka Employee (Jan. 12, 2017 5:37 PM EST) [ECF No. 53-1] ("Harrell's January 12, 2017 Email") (errors in original) (emphasis added)). Keep the italicized phrase from this email in mind because it's the only shred of evidence Harrell offers for her sex-discrimination claim. Months later, on July 27, 2017, Harrell resigned from her role as City Manager. *See* City's SOF ¶ 7.

### B. October 4, 2018–December 12, 2018: Harrell's second stint as City Manager

As the Miami Herald explained, in an article Harrell cites, the City Manager's position had become a kind of revolving door. *See* Sarah Blaskey, *Opa-Locka Turns Back the Clock and Rehires its City Manager-Turned-Whistle-Blower*, THE MIAMI HERALD (Dec. 14, 2018) [ECF No. 53-4] (the "Miami Herald Article") at 2. As relevant here, "[t]he interim City Manager prior to Harrell's return to the City in October 2018, Newell Daughtrey, was terminated by the former City Commission in October 2018. That same Commission hired Harrell to replace Daughtrey in October 2018." City's SOF ¶ 33; Harrell's Response (not disputing this). In other words, "Daughtrey was fired on October 2, [2018] after just six months on the job and replaced by Yvette Harrell[.]" Miami Herald Article at 2; Harrell's Response (not disputing this point). Harrell "always understood that she was hired in an interim capacity in October 2018, as [Mayor Matthew Pigatt] discussed with [her] how the City intended to hire a permanent City Manager and how he desired for the City to engage a recruiting firm to conduct a national search for a permanent manager." City's SOF ¶ 40 (quoting the Declaration of Mayor Matthew Pigatt [ECF No. 47-3] ("Pigatt Decl.") ¶ 9; Harrell's Response (not disputing this point).

In early November 2018 (just a month into Harrell's second stint as City Manager) the people of Opa Locka voted in a new City Commission. *See* City's SOF ¶ 34 ("[T]he *newly-elected* and constituted November 2018 City Commission *was not to be bound* by the actions of the former Commission." (emphasis added)); Harrell's Response (not disputing this point). And the new City Commission

"made it very clear that a national search would be conducted to find a permanent City Manager with skills and experience in operating a local government[,] as the City experienced far too much turnover with this position in years past and sought stability with respect to such position." City's SOF ¶ 35 (citing Kelley Decl. ¶ 25); Harrell's Response (not disputing this point).

One of the new commissioners was Sherelean Bass. *See* Declaration of Sherelean Bass [ECF No. 47-2] ("Bass Decl.") ¶ 2 ("I served as Commissioner on the City of Opa-Locka's five-member Commission from November 2018 to November 2020." (cleaned up)); Harrell's Response (not disputing this point). Commissioner Bass is female. *See* Harrell's Response at 11 (agreeing that "Bass is a female"). Kelley was also part of the new City Commission. *See* Kelley Decl. ¶ 2 ("I served as a Commissioner on the City of Opa Locka's five-member Commission from November 2018 to November 2020. I have also served as a City Commissioner, Mayor, and Vice Mayor at various other times since 2000."); Harrell's Response (not disputing this point).

In Harrell's first meeting with Commissioner Bass—shortly after Bass was elected—"Harrell spoke negatively to Bass about the City and the state oversight board and told Bass she did not believe the state oversight board had the City's best interests in mind, that the state oversight board was not working with the City, and that the state oversight board was not supporting the City." City's SOF ¶¶ 17–18.[2] Commissioner Bass left that conversation with a poor impression of Harrell and "became

---

[2] In an unsworn declaration she attached to her Response, Harrell avers that she "at no time spoke negatively to Bass about the City or the oversight board." Declaration of Yvette Harrell [ECF No. 53-5] ("Harrell Decl.") ¶ 12. Normally, of course, we'd credit Harrell's side of the story. But this averment doesn't create a genuine issue here because Harrell *didn't sign or date* her declaration, *see id.* at 2 (showing no signature or date)—as the law requires, *see* 28 U.S.C. § 1746 (requiring that declarations be "subscribed by [the declarant], as true under penalty of perjury, and dated"). We thus cannot—and will not—consider Harrell's declaration in adjudicating the City's MSJ. *See Carr v. Tatangelo*, 338 F.3d 1259, 1273 n.26 (11th Cir. 2003) ("Unsworn statements do not meet the requirements of Fed. R. Civ. P. 56(e) and cannot be considered by a district court in ruling on a summary judgment motion." (cleaned up)); *see also Nissho-Iwai Am. Corp. v. Kline*, 845 F.2d 1300, 1306 (5th Cir. 1988) ("It is a settled rule in this circuit that an unsworn affidavit is incompetent to raise a fact issue precluding summary judgment."); *Ifergane v. Fratellini*, 2020 WL 248969, at *2 n.2 (S.D. Fla. Jan. 16, 2020) (Scola, J.)

concerned about Harrell's negativity"; in particular, she believed "that a City Manager, such as Harrell, should be on the same page as the state oversight board given the dire financial situation the City experienced at that time." Bass Decl. ¶¶ 6–7; Harrell's Response (only disputing this in her declaration—which (as we've said) isn't evidence and thus doesn't create a genuine issue of fact).

Nor did Harrell make amends with Commissioner Kelley during her second stint as City Manager. If anything, in fact, their relationship deteriorated. In a letter she sent to the City Commission on November 14, 2018, Harrell alleged that "[a]t least one member of the sitting Commission": (1) "required Staff to perform tasks for private citizens during their City work day"; (2) "used [his] position to directly influence and interfere with personnel decisions that are reserved for the Manager, namely the reinstatement of terminated personnel"; and (3) "used [his] position and influence to create a working environment not conducive to productivity because of their direct ridicule and criticism towards City Staff." Letter from Yvette Harrell, Esq., City Manager of Opa Locka, to the City Commission of Opa Locka (Nov. 14, 2020) [ECF No. 53-2] ("Harrell's November 14, 2018 Letter"). In an email she sent twelve days later, Harrell identified Kelley as the "one member of the sitting Commission" she was complaining about. *See* E-mail from Yvette Harrell, City Manager of Opa Locka, to Matthew Pigatt, Mayor of Opa Locka (Nov. 26, 2018 9:49 AM EST) [ECF No. 53-3] ("Harrell's November 26, 2018 Email").

---

("Because Ifergane's declaration is neither signed nor dated, the Court will not consider it in evaluating the Defendants' motions for summary judgment."); *Beard v. Green*, 2010 WL 411084, at *10 (S.D. Fla. Jan. 29, 2010) (Seitz, J.) ("Just as is true for an unsworn affidavit, a document which does not meet the requirements of Fed. R. Civ. P. 56(e) or 28 U.S.C. § 1746, is to be disregarded by a court in conjunction with its review of the record in consideration of a defendant's motion for summary judgment."); *Bryant v. Orlando Sentinel Commc'ns Co.*, 2007 WL 1796258, at *5 (M.D. Fla. June 20, 2007) (noting that an "affidavit [was] deficient" because "the document contains no signature or seal," and adding that this deficiency "render[s] Plaintiff's affidavit inadmissible for purposes of ruling on the [defendant's] motion for summary judgment").

### C. The Fateful Commission Meeting[3]

On December 12, 2018, the City Commission met for an open—and publicly scheduled—meeting at an Opa Locka auditorium. *See* Meeting Minutes at 1. The meeting, which was video- and audio-recorded, began with a "call to order," a "roll call," an "invocation," and a "pledge of allegiance." Meeting Video at 0:01–4:20; *see also* Meeting Minutes at 1. Seated on the dais, from left to right, were City Clerk Joanna Flores, the five members of the City Commission—Kelley, Vice Mayor Chris Davis, Mayor Pigatt, Commissioner Alvin Burke, and Bass—City Manager Harrell, and City Attorney Brown. *See generally* Meeting Video. A "Resolution of the City Commission of the City of Opa Locka, Florida, Terminating City Manager Yvette Harrell"—which we'll refer to as "the Resolution"—was listed on the meeting's agenda as "Action Item 13-9." Meeting Minutes at 5. At the outset of the meeting, Mayor Pigatt designated the Resolution for separate discussion. *See* Meeting Video at 3:50–4:50; *see also* Meeting Minutes at 1, 5.

When the time came for public comment, three Opa Locka residents spoke up on Harrell's behalf. *See* Meeting Minutes at 3–4. The first of these, Dorothy Johnson, said that she was "concerned that the City is constantly replacing managers" and opined that "the City needs stability." Meeting Video at 14:20–14:40. She also urged the Commission to "give [Harrell] a chance" and asked the commissioners: "[P]lease do not let your City Manager go because of personality or retaliation." *Id.* at 14:55–15:30.

The second resident, Manuel Perez, asked to know "why we have to move the Manager so often? Don't you think we should give them more time to show us what they can do? I think that's good if you see them do the job little by little instead of taking them up and down, up and down, and

---

[3] We take the facts about this meeting from two sources: (1) a video recording of the meeting, which the City filed conventionally [ECF No. 50] (the "Meeting Video"); and (2) the "Clerk's Action Summary Minutes from the Regular Commission Meeting on Wednesday, December 12, 2018" [ECF No. 47-5] (the "Meeting Minutes").

10

that way we know what they can do." *Id.* at 15:30–16:30.

Finally, Herbert Tarvin—on behalf of himself and other unnamed residents who couldn't attend—insisted that "we need to save this lady's job." *Id.* at 20:00–20:30. Tarvin praised Harrell for listening to his "vision from the citizens' point of view" and called out other commissioners for not doing the same. *Id.* at 20:45–21:10. He concluded by telling Harrell that "the citizens have your back" and imploring the commissioners to "give the lady a chance[.]" *Id.* at 21:20–23:20.

After Kelley introduced the Resolution, Mayor Pigatt—noting that the City was in the process of starting a national search for a new manager—asked the Commission to defer the vote. *Id.* at 1:00:30–1:03:18 (noting that such a deferral would promote "stability and a smooth transition"). The mayor insisted that a hasty vote on the Resolution would "continue the tradition of the past" and would require the "abrupt transition of the City Manager and appointment of someone whom [the City Commission] has no knowledge of." *Id.* at 1:03:20–1:03:40. Kelley was unmoved. Sitting just a few feet from Harrell, he explained, in passionate terms, why (in his mind) the City could not afford to postpone Harrell's termination:

> Let me begin by stating that it's nothing personal against Ms. Harrell as a person. It has to do with what I believe to be best for the City. [When] Ms. Harrell was elevated to the City Manager position the first time, I stated then the City needs a professional City Manager; we need someone who has managerial experience to guide this City through the difficult times. At that time, there were several pressing items for the City, including the waste hauler selection recommendation. And while there were several options available, this manager [Harrell], in my opinion, waited until the eleventh hour and we were forced to engage Miami Dade County . . . . We gave up potential franchise fees, our City dump site, and more to the extreme, we had to enter a five-year agreement. To me this has caused a disconnect in why we have trash piles all over the City and because there was never really clear communication and a process put in place. Not only that, but low employee morale, an overall lack of experience in dealing with many of the day-to-day infrastructure and City needs. This included, in my opinion, the relationship and working accord with the financial oversight board, because everything we did, in my opinion, appeared to be reactionary rather than proactive . . . . To me, there was an unwillingness to tell the Commission "no" with explanations when it came to certain things . . . and then, for whatever reason, she left the City.

*Id.* at 1:03:43–1:05:40.

Kelley then "fast-forward[ed]" to the City's decision to "hire[ ] someone months ago" (Daughtrey), who "put things in place and more importantly put fiscal accountability back into the City and began to address critical issues with our infrastructure, our sewer system, and even the audits." *Id.* at 1:05:45–1:06:10. Kelley complained that, "in an unusual move and without any real notice, or an outlined critique, the [previous Commission] fired him, saying 'the audits weren't done,' 'the budget wasn't passed,' all of that, even though they had been submitted." *Id.* at 1:06:12–1:06:40. And Kelley opined: "[W]e *had* a professional manager. We *had* one that was doing their job . . . . But our *current* manager was brought back and has had several situations occur that, in my opinion, a professional manager should address." *Id.* at 1:06:50–1:07:54 (emphases added & cleaned up). Specifically, Kelley criticized Harrell for (1) failing to "find out from the community what's really going on," (2) failing to address the City's "public safety challenges—shootings, murders, and the like, with no recommendation to address the increase," and (3) creating an environment in which "employee morale [was at an] all-time low"—in part because "staff [was] fearful to even talk in fear of retribution." *Id.* at 1:08:00–1:09:15. Kelley concluded by saying that "we must move in a different direction." *Id.* at 1:09:50–1:10:03.

Commissioner Burke then jumped in to support the Resolution. He "ran on change," he said, and added that he's received "comments from employees saying that [Harrell] belittles them, they can't talk to her, and that morale is at an all-time low in our City." *Id.* at 1:11:25–1:12:34.

Commissioner Davis, for his part, opposed the Resolution—saying that "the City oftentimes takes one step forward and then two steps back and I refuse to be a part of that process." *Id.* at 1:13:00–1:13:18. Davis thus objected to the Resolution "on timing alone" and opined that "a new Commission with four new seats [hasn't] had the time to adequately address the Manager's so-called frivolous behavior." *Id.* at 1:13:20–1:13:41.

Mayor Pigatt was the last to speak: He disputed some of Kelley's comments, praised Harrell's work, and (noting that the City was about to launch a nationwide search for a permanent manager) worried about what a favorable vote on the Resolution would say to would-be applicants. *Id.* at 1:14:00–1:17:00. In his words:

> That is why I am completely not in support of any appointments; you will never see me support an appointed City Manager at this moment. We must go through a national process. And the next City Manager we get here needs to be respected, be certified, and that will stay for years to come. I don't want to go through this process 'oh we're going to get a new City Manager and now she's trying to hire another City Manager'; that sends the wrong message to anybody who would even apply to work here in the City of Opa Locka.

*Id.* at 1:18:00–1:19:25.[4]

Mayor Pigatt then proposed to give "one minute" to "anyone" who wanted to respond to the Resolution. *Id.* at 1:19:26–1:19:30. But Kelley, Burke, and Bass forced an up-or-down vote on the Resolution by pushing to cut off further discussion. *Id.* at 1:19:30–1:20:30. The ultimate vote on the Resolution went down this way:

| | |
|---|---|
| Commissioner Burke: | Yes |
| Vice Mayor Davis: | No |
| Commissioner Kelley: | Yes |
| Commissioner Bass: | Yes |
| Mayor Pigatt: | No |

*Id.* at 1:20:40–1:21:08; *see also* Meeting Minutes at 6. Just like that, Harrell had been fired. *See* "Resolution of the City Commission of the City of Opa Locka, Florida, Terminating City Manager,

---

[4] The City later contracted with a recruiting firm to look for "a permanent City Manager." City's SOF ¶ 36; *see also* "Resolution 19-9645" [ECF No. 47-8] (the "National City Manager Search Resolution") (allowing the City Commission to retain the recruiting firm to conduct a nationwide search for a new manager); Harrell's Response (not disputing this point). That recruiting firm "conducted a detailed national search" and "identified eight finalists" from around the country. City's SOF ¶¶ 37–38; *see also* City Manager Search Update: Recommended Candidates [ECF No. 47-9] (the "City Manager Search Update") at 1–4; Harrell's Response (not disputing this point). All eight finalists—including the candidate the City ultimately selected—were men. *See* City Manager Search Update at 1–4; Harrell's Response (not disputing this).

Yvette Harrell" [ECF No. 47-6] (the "Executed Resolution"). As this recitation makes plain, the subject of Harrell's sex never came up at the meeting. In any case, Harrell never defended herself against Kelley and Burke's charges—nor did she ever suggest that her termination had something to do with her sex.

With Harrell gone, Kelley immediately moved to re-appoint Daughtrey as Acting City Manager. Meeting Video at 1:21:15–1:24:08; *see also* Meeting Minutes at 6 ("[a] Resolution of the City Commission of the City of Opa-Locka, Florida, Appointing an Acting City Manager due to the Departure of Yvette Harrell as City Manager" (cleaned up)). When Mayor Pigatt tried to introduce two other candidates for the now-vacant position, Kelley objected and had Brown (the City Attorney) clarify that "the process that's been employed by the City Commission since I have been here, and that's been [in place] through eight City Managers" only allows for the consideration of one appointee. Meeting Video at 1:24:15–1:25:30. Evidently frustrated, Mayor Pigatt cut in:

> I'm extremely disappointed. You can literally feel it in this room how disappointed so many people are in this decision. It is a shame that we continue to go back to the past. Yes, we voted for change, but this is not change. Then again, it is very clear, and it is sad and disappointing, that this is our direction at the moment.

*Id.* at 1:32:00–1:32:40 (cleaned up). The Commission then swore Daughtrey into office—"in the middle of [the] City Commission meeting"—so that he could discuss some other, unrelated items. *Id.* at 1:38:00–1:40:00.

### D. Harrell's pre-suit communications with the EEOC

On January 3, 2019, approximately three weeks after her termination, Harrell notified the City of her intent to sue. *See* Harrell's Notice of Intent to Sue (Jan. 3, 2019) [ECF No. 22-1] at 2–4. On October 7, 2019, Harrell "filed a dual Charge of Discrimination with the EEOC and the Florida Civil Rights Commission alleging that the City violated Title VII." Am. Compl. ¶ 7; *see also* Harrell's Discrimination Charge (Oct. 7, 2019) [ECF No. 31-1]. And, on January 31, 2020, the U.S. Department

of Justice Civil Rights Division sent Harrell, via certified mail, a "Notice of Right to Sue Within 90

Days[.]" Harrell's Right-to-Sue Letter (Jan. 31, 2020) [ECF No. 22-1] at 1.

But Harrell "does not recall when she *received* her Right-to-Sue-Letter from the EEOC." City's

SOF ¶¶ 44–45 (emphasis added).[5] In fact, Harrell remembers very little about her correspondence

with the EEOC. As she explained at her deposition:

> Q. After your termination with the City of Opa Locka, did you file a charge of discrimination with the [EEOC?]
>
> A. Yes, at some point thereafter.
>
> Q. And you alleged gender discrimination; correct?
>
> A. Yes.
>
> Q. During the pendency of that charge of discrimination, did you communicate with the [EEOC] regarding your charge?
>
> A. I don't recall.
>
> Q. Did you ever inquire with the [EEOC] regarding the status of the [EEOC's] investigation?
>
> A. I may have. I don't recall.
>
> Q. Do you have a specific recollection of having any written communication with the [EEOC] regarding the status of its investigation?
>
> A. Aside from the letter that I received where they – yes, aside from the letter that I received, which I presume would be the right to sue letter, or whatever they classify it as, I didn't see any other communication from them.
>
> Q. My next question[ ] was at some point did you request a right [to] sue letter from the [EEOC?]
>
> A. Never requested one specifically. It was during my interview it was, I mean I interviewed, I said what I said, and then during the course of that conversation I was advised that the next step would be a right to sue letter in the event that the review of the information merited one.

---

[5] Harrell disputes this assertion in her inadmissible declaration. *See* Harrell's Response at 6 (citing "Harrell Declaration"). As we'll soon see, however, her objection is improper and cannot save her claim.

> Q. Did you receive a right to sue letter?
>
> A. I believe I did, yes.
>
> Q. *Do you recall when you received the right to sue letter*?
>
> A. *I do not recall.*

Video Deposition of Yvette Harrell [ECF No. 47-4] ("Harrell Depo.") at 3:5–4:17 (emphasis added).

Even after the City's lawyer showed her the Right-to-Sue Letter, Harrell couldn't recall when she'd received it:

> Q. Have you seen this document before?
>
> A. Yes.
>
> Q. It is dated January 31, 2020; correct?
>
> A. Yes.
>
> Q. And it was sent via certified mail?
>
> A. I don't recall if it was a certified mail document or not.
>
> Q. *That's fine. Do you have any specific recollection based on this document, when you received the right to sue letter?*
>
> A. *I don't.*
>
> . . . .
>
> Q. All right. Okay. All right. Did you – do you recall receiving the right to sue letter at your home?
>
> A. I believe I took it out of the mailbox.
>
> Q. Okay. Do you have any copies of the right to sue letter showing a stamp as to when you received the document?
>
> A. I wouldn't, because it didn't – I don't stamp documents when I receive them.
>
> Q. Do you have any other type of recordkeeping system or receipt system that would indicate when you received the right to sue letter?

A. I am sure if I looked for it I could find something that would confirm when I received it, *but I don't know when I received it.*

Q. When you say you are sure you could find something, are you referencing a calendar, a journal, anything like that?

A. It is probably on one of my older calendars.

Q. Do you know what you did with the right to sue letter, if anything, upon receipt of the right to sue letter?

A. I am sure I told my attorney that I received it.

Q. Now, again, you don't have any specific recollection as to when you specifically received the right to sue; correct?

A. *No, I don't have any specific recollection as to when I actually received it in my hands, no.*

Q. *So you don't know the exact date; correct?*

A. *No, I do not.*

Q. Aside from the January 31, 2020, right to sue letter, have you received any other right to sue letters from the [EEOC?]

A. Not to my knowledge, no.

*Id.* at 5:3–7:21 (emphases added).

Harrell filed this lawsuit on May 7, 2020—97 days after the EEOC mailed her the Right-to-Sue Letter. *See generally* Docket; Harrell's Response (not disputing this).

**E.  The Procedural History**

In her Amended Complaint, Harrell asserted six claims: (I) "Count I – Violation of Title VII – Gender Discrimination (42 U.S.C. § 2000E et seq.) (Disparate Treatment)"; (II) "Count II – Violation [of the] Florida Civil Rights Act (Gender Discrimination) (Disparate Treatment)"; (III) "[Count III] Violation of Title VII Retaliation"; (IV) "[Count IV] Florida Civil Rights Act Retaliation"; (V) "[Count V] Violation of Florida's Whistleblower Statute Fla. Stat. § 112.3187"; and (VI) "[Count VI] Breach of Contract." Am. Compl. [ECF No. 22]. "[B]ased on the parties' stipulation," we dismissed Count VI without prejudice. *See* Omnibus Order [ECF No. 39] at 2. And, since Harrell

never responded to the City's Motion for Judgment on the Pleadings [ECF No. 31], we dismissed Counts III, IV, and V by default—again, *without* prejudice, *see* Omnibus Order at 3. Harrell never moved for reconsideration of that decision, and she hasn't otherwise insisted that those claims be resuscitated. *See generally* Docket. Those claims are therefore no longer before us. *See, e.g., In re Mirant Corp. Sec. Litig.*, 2009 WL  48188, at *15 (N.D. Ga. Jan. 7, 2009) ("Plaintiffs have not moved for reconsideration of the Court's prior dismissal of these claims and the Court has not granted leave to Plaintiffs to reassert these claims. Failure to do so renders those claims a 'nullity[.]'").

Today, then, Harrell is proceeding on just two of her original six counts: Count I (Title VII sex discrimination) and Count II (FCRA sex discrimination). *See* Am. Compl. at 9–13. As we're about to see, though, neither count survives summary judgment.

## THE LAW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *Id.* at 248. A dispute about a material fact is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party. *Id.*

"The moving party bears 'the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Hickson Corp. v. Northern Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "Where the nonmoving

party bears the burden of proof at trial, the moving party may discharge this 'initial responsibility' by showing that there is an absence of evidence to support the nonmoving party's case or by showing that the nonmoving party will be unable to prove its case at trial." *Id.* (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437–38 (11th Cir. 1991)). "Once the moving party has properly supported its motion for summary judgment, the burden shifts to the non-moving party to come forward with specific facts showing that there is a *genuine issue for trial*." *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002) (emphasis in original).

When ruling on a motion for summary judgment, the Court "need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3); *see also Green v. Northport*, 599 F. App'x 894, 895 (11th Cir. 2015) ("The district court could consider the record as a whole to determine the undisputed facts on summary judgment."); *HRCC, Ltd. v. Hard Rock Cafe Int'l (USA), Inc.*, 703 F. App'x 814, 817 (11th Cir. 2017) (noting that a "court may decide a motion for summary judgment without undertaking an independent search of the record" (quoting FED. R. CIV. P. 56 advisory committee's note to 2010 amendment)). The "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (cleaned up). But "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 242).

In sum, "[i]f the record presents factual issues, the Court must not decide them; it must deny the motion [for summary judgment] and proceed to trial." *Whelan v. Royal Caribbean Cruises Ltd.*, 2013 WL 5583970, at *2 (S.D. Fla. Aug. 14, 2013) (cleaned up). On the other hand, if "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," then "the moving party is entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 323; *see also Lima v. Fla. Dep't of Children & Families*, 627 F. App'x 782, 785–86 (11th Cir.

2015) ("If no reasonable jury could return a verdict in favor of the nonmoving party, there is no genuine issue of material fact and summary judgment will be granted." (cleaned up)).

## ANALYSIS

### I.      Timeliness

We begin with the City's contention that Harrell's Title VII claim is untimely. *See* MSJ at 2 ¶ 4 ("The City is entitled to judgment on Harrell's Count I Title VII gender discrimination claim because Harrell failed to timely file suit on that claim following receipt of her right-to-sue letter.").

It's axiomatic that "an employee must exhaust administrative remedies before filing a complaint of discrimination under Title VII of the Civil Rights Act of 1964." *Stamper v. Duval Cnty. Sch. Bd.*, 863 F.3d 1336, 1340 (11th Cir. 2017) (cleaned up). "The first step down the path to exhaustion is filing a timely charge of discrimination with the EEOC." *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1317 (11th Cir. 2001). "Under Title VII, in cases where the EEOC does not file suit or obtain a conciliation agreement, the EEOC 'shall so notify the person aggrieved and *within 90 days* after the giving of such notice a civil action may be brought against the respondent named in the charge . . . by the person claiming to be aggrieved.'" *Zillyette v. Cap. One Fin. Corp.*, 179 F.3d 1337, 1339 (11th Cir. 1999) (quoting 42 U.S.C. § 2000e–5(f)(1) (emphasis added)). The plaintiff bears the "burden of establishing that he filed his Complaint within ninety days of his receipt of the EEOC's right-to-sue letter." *Green v. Union Foundry Co.*, 281 F.3d 1229, 1234 (11th Cir. 2002) (cleaned up).

The 90-day limitation period begins to run "upon notification of the aggrieved party," which occurs "upon actual receipt of the suit letter[.]" *Zillyette*, 179 F.3d at 1339. The Eleventh Circuit, however, does not "employ a rule determining when a complainant has [*actually*] received notice of the right to sue. Rather, we have imposed upon complainants some minimum responsibility for an orderly and expeditious resolution of their claims, and we have expressed concern over enabling complainants to enjoy a manipulable open-ended time extension which could render the statutory minimum

meaningless." *Kerr v. McDonald's Corp.*, 427 F.3d 947, 952 (11th Cir. 2005) (cleaned up). The upshot is that our Circuit "has continued to approach these issues on a case-by-case basis to fashion a fair and reasonable rule for the circumstances of each case[.]" *Zillyette*, 179 F.3d at 1341 (cleaned up).

"When the date of receipt [of a right-to-sue letter] is in dispute, we ordinarily presume that a mailing is received three days after its issuance." *Robbins v. Vonage Bus., Inc.*, 819 F. App'x 863, 867 (11th Cir. 2020) (cleaned up); *see also Baldwin Cnty. Welcome Ctr. v. Brown*, 466 U.S. 147, 148 n.1 (1984) (same). To rebut this presumption, the plaintiff must "show that receipt of the notice was delayed through no fault of [her] own," such as by showing that she "advised the EEOC of address changes or took other reasonable steps to ensure delivery of the notice to [her] current address." *Robbins*, 918 F. App'x at 867 (cleaned up). A plaintiff fails to meet her burden if she simply testifies that she "could not remember" the date on which she received the right-to-sue letter, or if she fails to "otherwise rebut the fact that [more than 90 days] elapsed from the date of mailing to the date of filing." *Green*, 281 F.3d at 1234.

In our case, it's undisputed: (1) that the EEOC *mailed* Harrell's Right-to-Sue Letter on January 31, 2020, *see* Harrell's Right-to-Sue Letter; and (2) that Harrell filed this lawsuit on May 7, 2020, *see* Docket—97 days later. Since "the date of receipt" is "in dispute," we "presume" that Harrell received the Right-to-Sue Letter "three days after" it was issued. *Robbins*, 819 F. App'x at 867. That presumption doesn't help Harrell here, though, because she missed the window by *seven* days. So, even if we gave her those three extra days, her filing would still be *four* days late.

As we've explained, this three-day presumption doesn't apply *only* "if the plaintiff can show that receipt of the notice was delayed through no fault of [her] own," such as by showing that she "advised the EEOC of address changes or took other reasonable steps to ensure delivery of the notice to [her] current address." *Robbins*, 819 F. App'x at 867 (cleaned up). Harrell never even argues that her notice was delayed through no fault of her own. *See generally* Harrell's Response. She doesn't, for

instance, say that she "advised the EEOC of address changes or that she took other reasonable steps to ensure delivery of the notice to her current address." Harrell has thus forfeited any such arguments. *See, e.g.*, *United States v. Campbell*, 26 F.4th 860, 873 (11th Cir. 2022) (en banc) (holding that the "failure to raise an issue in an initial brief . . . should be treated as a forfeiture of the issue, and therefore the issue may be raised by the court sua sponte [only] in extraordinary circumstances"); *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004) ("In the first place, the law is by now well settled in this Circuit that a legal claim or argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed.").

Notably, a plaintiff fails to meet her burden if she does nothing more than testify that she "could not remember" the date on which she received the right-to-sue letter, or if she fails to "otherwise rebut the fact that [more than 90 days] elapsed from the date of mailing to the date of filing." *Green*, 281 F.3d at 1234. And that's exactly what Harrell has done here. As we've recounted, when pressed about the date on which she received the letter, Harrell twice said that she didn't recall. *See* Harrell Depo. at 4:13–17 ("Q: Did you receive a right to sue letter? A: I believe I did, yes. Q: Do you recall when you received the right to sue letter? A: I do not recall."); *id.* at 7:10–17 ("Q. Now, again, you don't have any specific recollection as to when you specifically received the right to sue; correct? A. No, I don't have any specific recollection as to when I actually received it in my hands, no. Q. So you don't know the exact date; correct? A. No, I do not."). That's really the end of that.

Courts in our Circuit routinely find Title VII claims untimely in similar circumstances. *See, e.g.*, *Waring v. Miami-Dade Cnty.*, 172 F. Supp. 3d 1343, 1346 (S.D. Fla. Mar. 23, 2016) (Ungaro, J.) (granting summary judgment on a Title VII claim because, "[i]n this case, even when viewing the record evidence in the light most favorable to [p]laintiff, the only reasonable conclusion that can be drawn from the record is that [p]laintiff failed to file her lawsuit within the 90-day period required by law"); *Valdez v. Miami-Dade Cnty.*, 2020 WL 2113499, at *4 (S.D. Fla. May 4, 2020) (Scola, J.) (finding a Title

VII claim untimely and granting summary judgment); *Carter v. Brown Mackie Coll. Miami & Educ. Mgmt. Corp.*, 2016 WL 6496632, at *1 (S.D. Fla. Feb. 4, 2016) (Cohn, J.) (dismissing a Title VII claim as time-barred because a plaintiff filed her lawsuit 97 days after receiving her right-to-sue letter).

And the Eleventh Circuit regularly affirms these decisions. *See, e.g.*, *Green*, 281 F.3d at 1234 (affirming summary judgment because the plaintiff filed her complaint 97 days after receiving her right-to-sue letter); *Stamper*, 863 F.3d at 1340–42 (affirming summary judgment after holding that a second notice of the plaintiff's right to sue—issued after her original limitations period expired—didn't revive the 90-day period);[6] *Law v. Hercules, Inc.*, 713 F.2d 691, 693 (11th Cir. 1983) (affirming summary judgment on an untimely Title VII claim); *Bell v. Eagle Motor Lines*, 693 F.2d 1086, 1087 (11th Cir. 1982) (same).

Against all this, Harrell points to only one piece of evidence—the declaration she appended to her Response. *See* Response at 6 ("Plaintiff's Right to sue letter was dated and mailed to the Plaintiff on January 31, 2020. Plaintiff received the letter on February 8, 2020. She immediately notified her attorney of the receipt of the Right to Sue Letter via text message. *Harrell Declaration*. Plaintiff's complaint was filed on May 7, 2020. The complaint was filed on the 90th day which is allowed under the statute."). But there are two problems with this argument. *First*, as we've explained, we won't consider a declaration that hasn't been signed or dated. *See supra* note 2. *Second*, a party cannot survive summary judgment by producing, in her opposition brief, a declaration that (directly) contradicts the things she herself said, under oath, at her deposition—at least when she does so without explanation.[7]

---

[6] *Stamper* devolved into a detailed (and interesting) discussion of equitable-tolling principles. For reasons that aren't relevant here, the court ultimately concluded that equitable tolling *didn't* apply in that case. But we needn't delve into questions of equitable tolling today because Harrell never suggests that we should. *See Case v. Eslinger*, 555 F.3d 1317, 1329 (11th Cir. 2009) ("A party cannot readily complain about the entry of a summary judgment order that did not consider an argument they chose not to develop for the district court at the time of the summary judgment motions." (cleaned up)).

[7] We add this caveat because we might have come out differently if Harrell had given us some explanation for her resurrected recollection. She doesn't, for instance, say that she checked her

*See, e.g., Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1306 (11th Cir. 2016) ("The Eleventh Circuit, in limited circumstances, allows a court to disregard an affidavit as a matter of law when, without explanation, it flatly contradicts his or her own prior deposition testimony for the transparent purpose of creating a genuine issue of fact where none existed previously." (cleaned up)); *Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984) ("When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.").

In very similar circumstances, in fact, the Eleventh Circuit had this to say about a plaintiff who, after testifying that she didn't remember *when* she received her right-to-sue letter, tried to save her Title VII claim with a contradictory affidavit:

> As the district court noted, Bryant's affidavit, in which she stated that she remembered the exact date on which she received the right-to-sue letter, flatly contradicted her earlier deposition testimony, in which she stated that she did not remember the date. The affidavit, filed after her deposition had been taken and discovery had closed, supplied a specific fact that Bryant denied knowledge of when questioned on deposition. Notably, the affidavit presented no valid reason for Bryant's subsequent recollection that she received the letter on the specific date, December 5. For example, while Bryant was entitled to refresh her memory, her affidavit did not state that her recollection had been refreshed. True, her attorney argued that her recollection had been refreshed, but counsel's argument is not evidence. In sum, we affirm the district court's decision striking the affidavit.

---

calendar or her text messages and found there *some* evidence—not available to her during her deposition—that jogged her memory. And, it goes without saying, she doesn't provide us with a picture or other reproduction of that memory-inducing calendar or text message. We also find it telling that she shows us no declaration, affidavit, or deposition testimony from her lawyer—the one who allegedly received the text message on February 8, 2020—to support her claim that she sent him the message on that day. If Harrell's statement were true, in other words, it could only have *become* true by virtue of some piece of evidence that triggered a different recollection than the one she had at her deposition. And the problem we have here is that Harrell decided, despite months of discovery, not to offer that piece of evidence—whatever it might be—nor (even) to tell us what it is.

*Bryant*, 428 F. App'x at 897 (cleaned up). Our case is on all fours. Harrell was clear at her deposition that she didn't remember *when* she received the Right-to-Sue Letter. Now, after discovery has closed—and trying to save her claim from summary judgment—she's suddenly produced an (unsigned) declaration, in which she purports to remember the precise day on which the letter arrived in her mailbox—all without explaining *how* her recollection was refreshed. We aren't fooled. Indeed, in two critical ways, Harrell's attempt to resurrect her memory is even weaker than Bryant's was. *One*, Harrell's declaration is unsigned and undated—so, unlike the affidavit in *Bryant*, it isn't evidence at all. *Two*, neither Harrell nor her lawyer even attempted to argue that her recollection had somehow been refreshed. Count I is time-barred.

But that still leaves us with Harrell's FCRA claim (Count II). The FCRA is "modeled after Title VII," which means that "claims brought under [the FCRA] are analyzed under the same framework" that governs Title VII claims. *Alvarez v. Royal Atlanta Dev., Inc.*, 610 F.3d 1253, 1271 (11th Cir. 2010). In other words, we have to go through the same Title VII analysis for Count II anyway. So, as we'll see, even if Harrell's Title VII claim *were* timely, it would still fail on the merits.

## II.    The Merits

"Title VII prohibits an employer from 'discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Schoenfeld v. Babbit*, 168 F.3d 1257, 1266 (11th Cir. 1999) (quoting 42 U.S.C. § 2000e-2(a)(1)). The FCRA is Title VII's state-law equivalent and, for our purposes, prohibits the same kinds of discriminatory conduct. *See* FLA. STAT. § 760.10(1)(a) ("It is an unlawful employment practice for an employer . . . [t]o discharge or to fail or refuse to hire any individual, or otherwise to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, pregnancy, national origin, age, handicap, or marital status.").

"A plaintiff in a Title VII action may attempt to show discrimination by offering either direct or circumstantial evidence." *Schoenfeld*, 168 F.3d at 1266 (cleaned up). "A plaintiff alleging a claim of disparate treatment must establish that the employer *intended* to discriminate against the protected group." *Armstrong v. Flowers Hosp., Inc.*, 33 F.3d 1308, 1313 (11th Cir. 1994) (emphasis added); *see also Denney v. City of Albany*, 247 F.3d 1172, 1182 (11th Cir. 2001) ("Disparate treatment claims require proof of discriminatory intent either through direct or circumstantial evidence." (cleaned up)). Harrell fails to offer *either* direct *or* circumstantial evidence of discrimination here.

## A. Direct Evidence

"Direct evidence is evidence which, if believed, proves the existence of the fact in issue without inference or presumption." *Jones v. Bessemer Carraway Med. Ctr.*, 151 F.3d 1321, 1323 n.11 (11th Cir. 1998); *see also EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1286 (11th Cir. 2000) (same). Direct evidence, in other words, is "powerful evidence capable of making out a prima facie case essentially by itself." *Jones*, 151 F.3d at 1323 n.11. "[O]nly the most blatant remarks, whose intent could be nothing other than to discriminate on the protected classification are direct evidence of discrimination." *Wills v. Walmart Associates, Inc.*, 2022 WL 845183, at *24 (S.D. Fla. Mar. 22, 2022) (Altman, J.) (quoting *Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1227 (11th Cir. 2002)). Direct evidence would include, for instance, "a frank admission from a manager that he refused to hire an applicant because he was black or because she was female." *Schweers v. Best Buy, Inc.*, 132 F. App'x 322, 324 (11th Cir. 2005) (quoting *Cooper v. Southern Co.*, 390 F.3d 695, 724 n.15 (11th Cir. 2004)); *see also Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990) ("One example of direct evidence would be a management memorandum saying, 'Fire Earley—he is too old.'").

Harrell never argues that she's satisfied this rigorous standard here, *see generally* Harrell's Response—which is reason enough to treat any such claim as forfeited, *see Campbell*, 26 F.4th at 873 (holding that the "failure to raise an issue in an initial brief . . . should be treated as a forfeiture of the

issue, and therefore the issue may be raised by the court *sua sponte* [only] in extraordinary circumstances").

Nor would any such argument have been viable. To understand why, let's go through the proof she cites in her Response—starting with her January 12, 2017 Email to City Attorney Vincent Brown, which, for three reasons, cannot supply direct evidence of discrimination.

*First*, the statements Harrell attributes to Commissioner Kelley in that email "are not a clear indication of discriminatory animus." *Bass v. Lockheed Martin Corp.*, 287 F. App'x 808, 811 (11th Cir. 2008). Harrell didn't, for instance, claim that Kelley said anything like: "Fire Harrell—she's a woman." Instead, she (for the most part) averred that she'd "endured consistent and persistent ridicule along with statements and actions purposed [sic] to humiliate and belittle" her and alleged that Kelley had made "demeaning and offensive comments"; that he'd "undermine[d]" her authority; and that he'd "lie[d]" about her to others. *See* Harrell's January 12, 2017 Email. Kelley (Harrell claimed) also "accused [her] of actions committed by former City Managers and employees"; "yell[ed] and gesture[d] at [her] in front of City staff and members of the Public"; and "went on a tirade about wanting the 'same treatment as the Mayor,' while [Harrell] stood there embarrassed and once again humiliated." *Id.* While these comments "may be inappropriate and condescending," they "clearly fall[] short of the type of evidence that this Circuit has recognized as direct evidence of discrimination." *Carter v. City of Miami*, 870 F.2d 578, 582 (11th Cir. 1989) (cleaned up).

Courts in this Circuit routinely refuse to "give great weight . . . to language that is, at best, only circumstantial evidence" because, to do otherwise, would be to "blur[] the important distinction between circumstantial evidence and direct evidence for prima facie cases." *Jones*, 151 F.3d at 1323 n.11. Indeed, faced with far more damning evidence, the Eleventh Circuit has repeatedly cast aside claims of direct discrimination. *See, e.g.*, *Walker v. St. Joseph's/Candler Health Sys., Inc.*, 506 F. App'x 886, 888 (11th Cir. 2013) (no direct evidence of discrimination, even where the decisionmaker told the

27

plaintiff she "should go back to the night shift" to "be with her own kind," because "the 'your own kind' statement does not prove race or gender discrimination without inference"); *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 642 (11th Cir. 1998) (no direct evidence of discrimination, even where the decisionmaker admitted that she had "a bias against blacks" and that "she found that they were difficult for her to trust or get along with," because those statements "could have been expressing a desire to get past such prejudices").

*Second*, where the email does approach the topic of sex discrimination, it does so—not with Kelley's own words—but with Harrell's speculation about what Kelley *might* have been thinking. As we've noted, in one part of the email, Harrell wrote: "I will no longer allow the fact that I am female and not [Kelley's] 'choice' for City Manager to be an accepted reason for mistreatment and harassment." Harrell's January 12, 2017 Email. In saying so, however, Harrell never explained what Kelley might have said (or done) to suggest, however obliquely, that he was antagonizing, demeaning, and humiliating her *because* she was a woman—rather than because he believed her to be incompetent, uncertified, or otherwise unqualified. Harrell thus hasn't done enough. *See Carter*, 870 F.2d at 585 (noting that the plaintiff's "subjective conclusion[s]", without supporting evidence, are insufficient to raise an inference of intentional discrimination); *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) ("[U]nsupported speculation does not meet a party's burden of producing some defense to a summary judgment motion. Speculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." (cleaned up)).

*Third*, the acrimony she referenced in that January 12, 2017 Email was simply too attenuated from—and, if we're being realistic, had absolutely nothing to do with—her termination. In that email, after all, Harrell was complaining about things that happened in January of 2017. *See* Harrell's January 12, 2017 Email. But the termination decision she's suing about happened in December of 2018, *see* the Executed Resolution—almost *two years* later. By then, the City Commission was composed of

people who weren't even around during Harrell's first stint as City Manager—when the January 12, 2017 Email was sent. The 2017 email, in short, was unrelated to—and entirely untethered from—the 2019 termination. It thus cannot supply Harrell with the direct evidence she needs. *See, e.g., Morgan v. Kalka & Baer LLC*, 750 F. App'x 784, 788 (11th Cir. 2018) (no direct evidence of discrimination, even where the named partner of the plaintiff's firm said he did not like "Black people" and "that's why they're in the back of the office," because "these remarks and others like them were unrelated to the decisionmaking process"); *Williamson v. Adventist Health Sys./Sunbelt, Inc.*, 372 F. App'x 936, 940 (11th Cir. 2010) ("A biased statement, separate in time from the employment decision under challenge, is not direct evidence of discrimination." (cleaned up)); *Scott*, 295 F.3d at 1227 (no direct evidence of discrimination, even where supervisor said "[w]e'll burn [the plaintiff's] black ass," because that statement was "too remote" and "was not directly related to the subject of [the plaintiff's] termination"); *Carter*, 132 F.3d at 642 (no direct evidence of discrimination, even where the decisionmaker admitted that she had "a bias against blacks" and that "she found that they were difficult for her to trust or get along with," because "the statement does not relate directly to the [challenged employment] decision").

And nothing that happened at the December 12, 2018 Commission meeting—where Harrell was fired—could be construed as direct evidence of discrimination. To the contrary, as we've said, Harrell's sex was never mentioned at all. Commissioner Kelley, in fact, opened his remarks "by stating that it's nothing personal against Ms. Harrell as a person." Meeting Video at 1:03:43. He then proceeded to lambast Harrell—not for her sex—but for her inability to (1) "find out from the community what's really going on," (2) address some critical "public safety challenges—shootings, murders, and the like, with no recommendation to address the increase," (3) raise "employee morale," which (Kelley claimed) was at an "all-time low," and (4) deal with the reality that "staff [was] fearful to even talk in fear of retribution." *Id.* at 1:08:00–1:09:15. Commissioner Burke likewise said nothing

about Harrell's sex. He explained that he "ran on change" and alleged that he'd received "comments from employees saying that she belittles them, they can't talk to her, and that morale is at an all-time low in our City." *Id.* at 1:11:25–1:12:34. And Commissioner Bass, as we've seen, said nothing at all. She did, however, submit a declaration in our case, in which she averred that Harrell's "negativity regarding the City and the state oversight board formed the basis for [her] decision to vote to terminate Harrell's employment." Bass Decl. ¶ 14. Again, nothing about sex.

Finally, we have the November 14, 2018 Letter and the November 26, 2018 Email. In the former, Harrell alleged that "[a]t least one member of the sitting Commission": (1) "required Staff to perform tasks for private citizens during their City work day"; (2) "used [his] position to directly influence and interfere with personnel decisions that are reserved for the Manager, namely the reinstatement of terminated personnel"; and (3) "used [his] position and influence to create a working environment not conducive to productivity because of their direct ridicule and criticism towards City Staff." Harrell's November 14, 2018 Letter. In the latter, Harrell identified Kelley as the "one member of the sitting Commission" she was complaining about. *See* Harrell's November 26, 2018 Email. Neither even purported to accuse Commissioner Kelley (or anyone else) of sex discrimination.

Because none of Harrell's evidence establishes—without inference or presumption—that she was terminated for a discriminatory purpose, it cannot serve as direct evidence of discrimination.

### B. Circumstantial Evidence

Circumstantial evidence "*suggests*—but does not prove—a discriminatory motive." *Burrell v. Bd. of Trustees of Ga. Military Coll.*, 125 F.3d 1390, 1393–94 (11th Cir. 1997); *see also Gonzalez v. Fla. Dep't of Mgmt. Servs.*, 683 F. App'x 738, 742 (11th Cir. 2017) ("If the alleged statement suggests, but does not prove, a discriminatory motive, then it is circumstantial evidence." (cleaned up)). "Discrimination claims brought under Title VII . . . are typically categorized as either mixed-motive or single-motive claims." *Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016). In a single-motive case—

where the employee alleges that her sex was the *sole* factor motivating the adverse action—"[a] plaintiff can establish intentional discrimination through circumstantial evidence in two ways." *Dukes v. Shelby Cnty. Bd. of Educ.*, 762 F. App'x 1007, 1011 (11th Cir. 2019). *First*, she may "satisfy[ ] the burden-shifting framework set out in *McDonnell Douglas*." *Lewis v. City of Union City*, 918 F.3d 1213, 1220 (11th Cir. 2019) (en banc).[8] *Second*, she can "demonstrate a 'convincing mosaic' of circumstantial evidence that warrants an inference of intentional discrimination."[9] *Id.* at 1221 n.6 (quoting *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)). By contrast, in mixed-motive cases—in which the employee avers that her sex was one of *several* factors motivating the adverse action—"[a]n employee challenging a decision made by a board can succeed . . . if she demonstrates that discriminatory input, such as sex or gender-based bias, *factored into the board's decisional process*." *Quigg*, 814 F.3d at 1241 (emphasis added & cleaned up). Although Harrell appears to invoke and apply the standards for both single- and mixed-motive claims in her Response, *see* Harrell's Response at 11–12 (citing both *McDonnell Douglas* and *Quigg*), her claims fail under either framework.

### a.  *McDonnell Douglas*

Harrell's *McDonell Douglas* claim falters at every step. "*McDonnell Douglas* established a three-step process for analyzing discrimination claims[.]" *Ehrhardt v. Haddad Rest. Grp., Inc.*, 443 F. App'x 452, 455 (11th Cir. 2011). *First*, "the plaintiff must . . . offer evidence sufficient to establish a *prima facie* case of discrimination[.]" *Vira v. Crowley Liner Servs., Inc.*, 723 F. App'x 888, 892 (11th Cir. 2018). *Second*,

---

[8] The test takes its name from the Supreme Court's decision in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973).

[9] Harrell never argues that she *can* "present a convincing mosaic of circumstantial evidence[.]" *Dukes*, 762 F. App'x at 1011–12 (cleaned up). She's thus forfeited any such argument. *See Access Now*, 385 F.3d at 1330 ("In the first place, the law is by now well settled in this Circuit that a legal claim or argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed."); *Versfelt v. Sanza Food Serv., LLC*, 2022 WL 479881, at *12 n.10 (S.D. Fla. Feb. 16, 2022) (Altman, J.) (concluding that a plaintiff alleging age discrimination under *McDonnell Douglas*—having failed to advance a convincing-mosaic claim—had forfeited "any such [mosaic] claim he might've had").

"[o]nce a prima facie case is made, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Id. Third*, "[i]f the employer meets its burden, the plaintiff must then show that the employer's stated reason is pretext for discrimination[.]" *Id.* We consider each step below.

### i. *Prima facie* Case

Under the first step of the *McDonnell Douglas* burden-shifting framework, the employee "bears the initial burden of establishing a *prima facie* case of discrimination by showing (1) that she belongs to a protected class, (2) that she was subjected to an adverse employment action, (3) that she was qualified to perform the job in question, and (4) that her employer treated 'similarly situated' employees outside her class more favorably." *Lewis*, 918 F.3d at 1220–21.[10]

The parties agree that Harrell has satisfied the first and third elements of her *prima facie* case. *See* MSJ at 4–7. Nor could the City have suggested otherwise: Harrell, after all, is a woman, and she

---

[10]   Harrell quotes this same standard. *See* Harrell's Response at 6 ("To establish a claim under Title VII and FCRA, a plaintiff must prove that: (1) she is a member of a protected class, (2) she was qualified for the position, (3) she suffered an adverse employment action, and (4) she was treated less favorably than a similarly situated individual outside of her protected class."). Admittedly, the Eleventh Circuit has stated the test somewhat differently in other cases. Sometimes it says that an employee can make out a *prima facie* case by showing that "(1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) *he was replaced by a person outside his protected class* or was treated less favorably than a similarly-situated individual outside his protected class." *Maynard v. Bd. of Regents of Div. of Univs. of Fla. Dep't of Educ. ex rel. Univ. of S. Fla.*, 342 F.3d 1281, 1289 (11th Cir. 2003) (emphasis added). The italicized portion of that text is missing from the Eleventh Circuit's *en banc* ruling in *Lewis* and from many of the court's other enunciations of the governing test. *See Hanford v. Geo Grp., Inc.*, 345 F. App'x 399, 405 n.7 (11th Cir. 2009) (recognizing that the Eleventh Circuit has stated the *McDonnell Douglas* test both with and without the "replacement" prong).
      But, for two reasons, Harrell's claim fails *even if* we assume that a plaintiff can make out a *prima facie* case *simply* by showing that she was replaced by a person *outside* her protected class. *First*, she never makes this argument—so, she's probably forfeited it. *See Case*, 555 F.3d at 1329 ("A party cannot readily complain about the entry of a summary judgment order that did not consider an argument they chose not to develop for the district court at the time of the summary judgment motions." (cleaned up)). *Second*, as we're about to see, whatever happens with this fourth element, Harrell plainly fails the second element of her *prima facie* test.

was fired. The City does, however, contend that Harrell failed to meet the second and fourth elements—and we agree.

Let's start with the second element—qualifications: "An individual is 'qualified' for a position, for purposes of employment discrimination law, if he meets the criteria that the employer has specified for the position." *Wright v. Southland Corp.*, 187 F.3d 1287, 1300 n.16 (11th Cir. 1999). "[T]o demonstrate that he was qualified for the position, a Title VII plaintiff need only show that he or she satisfied an employer's objective qualifications." *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 769 (11th Cir. 2005); *see also Anderson v. Embarq/Sprint*, 379 F. App'x 924, 928–29 (11th Cir. 2010) ("As to the second element—that he was qualified for the job—Anderson must show only that he satisfied Embarq's objective employment qualifications." (cleaned up)).

Harrell has failed to satisfy this element. Indeed, despite having thirteen months to gather discovery and develop the factual record, Harrell hasn't given us *any* evidence of what the City's "objective qualifications" were. She provides no testimony; she offers no job posting; and she appends no document that would elucidate for us what the City was looking for, what the job entailed, or (even) what she herself brought to the table. She seems, rather, to assume that she was qualified by virtue only of the fact that the City hired her for the role in the first instance. But, if that were enough, then every employee in America would automatically satisfy this second element *simply* by showing that she was initially hired for the position from which she was later terminated. This cannot be the law—and, fortunately, it isn't. *See Anderson*, 379 F. App'x at 928–29 ("Anderson has not shown he was qualified for his job [before he was fired]: he could not lift up to 70 pounds frequently and continuously, he suffered from neurological issues that caused bowel problems, he expressed concern regarding his ability to operate a forklift, and, above all, he had not been cleared by a physical to return to work."); *see also Aponte v. Brown & Brown of Fla., Inc.*, 2019 WL 12536011, at *9 (M.D. Fla. Mar. 1, 2019) (finding that a plaintiff who'd been fired hadn't shown that he was qualified for the position);

33

*Lowe v. Fla. Hosp. Med. Grp., Inc.*, 2016 WL 9503734, at *3 (M.D. Fla. Sept. 6, 2016) ("Plaintiff has not shown that she was qualified for the position she held with Defendant at the time she was terminated . . . . Plaintiff testified that at no point during her employment was she certified as required . . . or in accordance with her acknowledgements . . . . Therefore, because Plaintiff never held a valid certification during the time she was employed by Defendant, she was not qualified and her claims must fail." (cleaned up)).

Harrell—as we've hinted—also fails the fourth element of her *prima facie* case. "To meet the fourth prong, a comparator must be 'similarly situated in all material respects,' meaning that the plaintiff and comparators are 'sufficiently similar, in an objective sense, that they cannot reasonably be distinguished.'" *Earle v. Birmingham Bd. of Educ.*, 843 F. App'x 164, 166 (11th Cir. 2021) (quoting *Lewis*, 918 F.3d at 1228). A similarly-situated comparator "will ordinarily (1) have engaged in the same basic conduct as the plaintiff; (2) have been subject to the same employment policy, guideline, or rule as the plaintiff; (3) have been under the jurisdiction of the same supervisor as the plaintiff; (4) and share the plaintiff's employment history." *Id.* These considerations "leave[ ] employers the necessary breathing space to make appropriate business judgments." *Lewis*, 918 F.3d at 1227–28.

For three reasons, Harrell fails to satisfy this element. *First*, although Harrell claims that Daughtrey was similarly situated to her, she fails to give us any evidence to substantiate this allegation. She tells us nothing, for instance, about Daughtrey's employment history, *see generally* Harrell's Response—aside from the fact that he, too, was once fired by the City Commission, *see id.* at 7 ("The current male City manager was unable and could not perform the duties that were being asked of him at the time of my rehire. His name was Newall Daughtrey and ironically after the termination of the Plaintiff, the City voted to rehire him as the City Manager."). This fact, though, is deeply unhelpful to Harrell because it tends to confirm what the record has already shown us—which is that the City Commission has fired *many* managers over the years, women *and* men. The City may well be

34

discriminating against these managers on the basis of *something*—but that something doesn't appear to be sex. And, while she does tell us (in a footnote) that Daughtrey (like Harrell) "had complained in a memo to the City prior to his termination, that millions of dollars were being loss due to unpaid water bills by various local businesses," *id.* at 8 n.3 (errors in original), she never gives us any *evidence* to back this up. In fact, the footnote in which this claim appears contains no citation at all. The problem with all this, of course, is that, at summary judgment, a plaintiff must produce *evidence* to support her contention that the comparator is, as the Eleventh Circuit requires, similarly situated in all material respects. *See Earle*, 843 F. App'x at 166 ("A plaintiff's failure to produce evidence showing that a single similarly situated employee was treated more favorably will preclude the establishment of a *prima facie* case." (cleaned up)); *see also Jones v. Unity Behav. Health, LLC*, 2021 WL 5495578, at *6 (11th Cir. Nov. 23, 2021) (finding no *prima facie* case where "the *evidence* fails to show [the comparator] . . . had a similar history" (emphasis added & cleaned up).

*Second*, Harrell fails to show that she and Daughtrey "engaged in the same basic conduct[.]" *Earle*, 843 F. App'x at 166; *see also, e.g., Holmes v. City of Ft. Pierce*, 2022 WL 247976, at *6 (11th Cir. Jan. 27, 2022) (finding that the plaintiff failed to make out a *prima facie* case because the "alleged comparators did not engage in the same basic misconduct"). At Harrell's termination meeting, Kelley chastised her for (1) failing to "find out from the community what's really going on," (2) failing to address the City's "public safety challenges—shootings, murders, and the like, with no recommendation to address the increase," and (3) creating an environment in which "employee morale [was at an] all-time low"—in part because "staff [was] fearful to even talk in fear of retribution." Meeting Video at 1:08:00–1:09:15. Harrell has failed to submit *any* evidence for the proposition that Daughtrey engaged in similar misconduct.[11]

---

[11] Harrell (it's true) does aver that, during Daughtrey's first stint as manager, the City "was not performing under the terms of the decree issued by the state oversight board and was mired in

*Third*, even if we ignore the lack of evidence, Daughtrey can't be a viable comparator because he didn't *actually replace* Harrell. To the contrary, the evidence is undisputed that Daughtrey was brought back as an interim manager once Harrell was fired. In this role, he was asked only to perform the manager's duties while the City engaged in a nationwide search for Harrell's replacement. That replacement, of course, was John Pate—who took over for Daughtrey as City Manager after Harrell's termination. *See* Kelley Decl. ¶ 26; Pigatt Decl. ¶ 14; City's SOF ¶ 38; *see also* Harrell's Response (not disputing any of this). Pate, the City says, "had significant local government and public safety experience, was a former police lieutenant, and was otherwise qualified for the City Manager position given the City's financial and public safety issues at the time." City's SOF ¶ 39 (citing Kelley Decl. ¶ 26); Harrell's Response (not disputing this). And Harrell *never* even mentions Pate in her Response— much less does she present any evidence that *he* was similarly situated to her in all material respects.

Harrell, in short, has failed to meet her *prima facie* case.

### ii.  Legitimate, Non-Discriminatory Reasons

Even if Harrell had made out a *prima facie* case, the City would have satisfied its burden of proffering legitimate, non-discriminatory reasons for terminating her. At this stage, "the burden then shifts to the employer to produce a legitimate, nondiscriminatory reason for the action taken against the plaintiff." *Flowers v. Troup Cnty., Ga., Sch. Dist.*, 803 F.3d 1327, 1336 (11th Cir. 2015) (cleaned up).

---

controversy"—and (she adds) "there was an uptick in crime." Harrell's Response at 8–9. Three problems with this. *One*, again, Harrell offers no evidence to support either of these contentions. *Two*, as Harrell herself acknowledges, the City ultimately fired Daughtrey—a reality that seriously undermines her suggestion that he was treated *more* favorably than she was. And, while it's true that Daughtrey was later rehired, *see* Harrell's Response at 7, he was only brought back in an interim capacity and was, shortly after, let go, *see* City's SOF ¶ 39 (citing Kelley Decl. ¶ 26); Harrell's Response (not disputing this). *Three*, even here, Harrell never suggests that Daughtrey failed to communicate effectively with the community, that (during Daughtrey's tenure) City employees were wary of airing their grievances for fear of reprisals, or that (while Daughtrey was City Manager) morale was at an all-time low—all deficiencies that Kelley (and, to some extent, Burke and Bass) identified in *her* leadership style.

"The defendant's burden is one of production, not persuasion, and is 'exceedingly light.'" *Cotton v. Enmarket Inc.*, 809 F. App'x 723, 725 (11th Cir. 2020) (quoting *Smith v. Horner*, 839 F.2d 1530, 1537 (11th Cir. 1988)).

The City says that it fired Harrell because—in the opinions of Commissioners Kelley, Burke, and Bass—she "lacked satisfactory communication skills" to keep the City Commission apprised of current events, *see* City's SOF ¶ 12; she didn't respond to "an uptick in murders and shootings," *id.* ¶ 13; and she wasn't functioning like a "professional manager," *id.* ¶ 14. Unsurprisingly, poor job performance is a legitimate, non-discriminatory reason for firing an employee. *See, e.g., Jarvis v. Siemens Med. Sols. USA, Inc.*, 460 F. App'x 851, 856 (11th Cir. 2012) ("In this case, Siemens proffered three legitimate, non-discriminatory reasons for terminating Jarvis: (1) poor job performance, (2) insubordination, and (3) the knowing falsification of his timecard."); *Tolbert v. Briggs and Stratton, Corp.*, 256 F. App'x 340, 342 (11th Cir. 2007) (finding that "poor job performance" was a "non-discriminatory reason" for firing the employee). But poor performance wasn't the City's *only* reason for firing Harrell. At the termination meeting, in fact, Kelley claimed that "employee morale [was at an] all-time low" and that "staff [was] fearful to even talk [to Harrell] in fear of retribution." Meeting Video at 1:08:00–1:09:15. Burke likewise alleged that he'd received "comments from employees saying that [Harrell] belittles them, [that] they can't talk to her, and that morale is at an all-time low in our City." *Id.* at 1:11:25–1:12:34. And, in her declaration, Bass averred that Harrell's "negativity regarding the City and the state oversight board formed the basis for [her] decision to vote to terminate Harrell's employment." Bass Decl. ¶ 14. These, too, are legitimate reasons for firing someone. *See, e.g., Thompson v. DeKalb Cnty.*, 2021 WL 5356283, at *6 (11th Cir. Nov. 17, 2021) (finding that an employer presented "legitimate, non-discriminatory reasons for [the plaintiff's] termination" by pointing to the plaintiff's "hostile and arrogant" interactions with others); *Kohser v. Protective Life Corp.*, 649 F. App'x 774, 778 (11th Cir. 2016) (holding that an employer met its burden by showing that it fired the plaintiff "after

her subordinates submitted numerous complaints about her management style"); *Rosenfield v. Wellington Leisure Prod., Inc.*, 827 F.2d 1493, 1496 (11th Cir. 1987) (concluding that an employer "carried its burden" by providing evidence that "a client had called . . . to complain about" the plaintiff).

### iii.  Pretext

And no reasonable jury could find that the City's reasons for terminating Harrell were pretextual. "To avoid summary judgment the plaintiff must introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination." *Brooks v. Cnty. Comm'n of Jefferson Cnty.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (cleaned up) (quoting *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1228 (11th Cir. 1993)). "A reason is not pretext for discrimination 'unless it is shown *both* that the reason was false, *and* that discrimination was the real reason.'" *Id.* (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)). The employee "must address the employer's proffered legitimate reason[s] head on and rebut [them]." *Hawkins v. BBVA Compass Bancshares, Inc.*, 613 F. App'x 831, 838 (11th Cir. 2015) (cleaned up); *see also Crawford v. City of Fairburn*, 482 F.3d 1305, 1308 (11th Cir. 2007) ("The plaintiff must meet the reason proffered head on and rebut it." (cleaned up)). An employee can show pretext by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find all of [the employer's] reasons unworthy of credence." *Watkins v. Sverdrup Tech., Inc.*, 153 F.3d 1308, 1314 (11th Cir. 1998) (cleaned up). "If the employer proffers more than one legitimate, nondiscriminatory reason, the plaintiff must rebut each of the reasons to survive a motion for summary judgment." *Crawford*, 482 F.3d at 1308 (cleaned up).

None of Harrell's pretext contentions create a genuine issue of material fact. Here, again, evidence is the problem. Harrell starts by challenging the City's claim that "City staff feared talking to Harrell for fear of retribution and that employees did not feel comfortable talking to her." Harrell's Response at 7. To parry this claim, however, her lawyer says—without any citation—that "[t]his is

blatant a false statement and creates a genuine issue of fact to be determined by a jury." *Id.* (errors in original). But her lawyer's mere say-so cannot stand in for the evidence she was required to produce. *See Bryant*, 428 F. App'x at 897 (disregarding an unsupported argument by the plaintiff's lawyer because "counsel's argument is not evidence"). In the next sentence, she adds: "As shown in the letter to the City, the Plaintiff named names." *Id.* This sentence, too, comes without citation, so we're left to guess about what letter she's talking about.[12] In fairness to Harrell, she *did* attach a letter to her Response— the November 14, 2018 Letter she sent to the City Commission—and (we suppose) she *might* be referring to *that* letter. In that letter, remember, Harrell alleged that Kelley (1) "required Staff to perform tasks for private citizens during their City work day"; (2) "used [his] position to directly influence and interfere with personnel decisions that are reserved for the Manager, namely the reinstatement of terminated personnel"; and (3) "used [his] position and influence to create a working environment not conducive to productivity because of their direct ridicule and criticism towards City Staff." Harrell's November 14, 2018 Letter. The problem with this letter, of course, is that it never alleges—and certainly includes no evidence of—sex discrimination. Indeed, it never mentions Harrell's sex *at all* and never so much as speculates that her disagreements with Kelley (however vitriolic and unfair) had anything to do with sex.[13]

---

[12] That would be reason enough to disregard this sentence. *See, e.g., Chavez v. Sec'y, Fla. Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) (noting that the district court has no independent obligation to "mine the record"); *Atlanta Gas Light Co. v. UGI Utils., Inc.*, 463 F.3d 1201, 1209 n.11 (11th Cir. 2006) ("Neither the district court nor this court has an obligation to parse a summary judgment record to search out facts or evidence not brought to the court's attention."); *Albrechtsen v. Bd. of Regents of Univ. of Wis. Sys.*, 309 F.3d 433, 436 (7th Cir. 2002) (Easterbrook, J.) ("Courts are entitled to assistance from counsel, and an invitation to search without guidance is no more useful than a litigant's request to a district court at the summary judgment stage to paw through the assembled discovery material.").

[13] If the "letter" she's referring to is the January 12, 2017 Email she sent to City Attorney Brown, then—for all the reasons we've outlined, *see supra* at 27–29—that email isn't probative of anything. To recap: (1) none of the statements Harrell attributes to Kelley in that email had anything to do with sex discrimination; (2) where discrimination was mentioned, it appeared only in the context of Harrell's speculation about what Kelley *might* have been thinking; and (3) the email focuses on conduct that's

The rest of Harrell's Response suffers from similar deficiencies. So, for instance, moving beyond her own problems with City staff, Harrell says this:

> The statement that the Plaintiff failed to effectively communicate regarding City events, workshops, and business is an untrue statement. The statements presented in the Defendant's summary judgment regarding the recommendation or develop a plan of action to address murders and shootings, that she spoke negatively about the City and the State Oversight board are also pretextual and false. The City suffered an uptick in murders and shooting during the term of city manager, Daughtrey. A general google search by the Court will show that the Miami Herald published an article entitled, "Two Miami-area Cities among the most dangerous in the country." on May 8, 2018, 5 months prior to the City voting to bring the Plaintiff back as the city manager. Plaintiff has no knowledge of the speaking negatively about the City unless, the Defendant is referring to the results of her investigation. *Harrell Declaration.*

Harrell's Response at 9 (errors in original). Again, there's no evidence here. The only citation is to Harrell's Declaration and an unattached Miami Herald article—neither of which, it goes without saying, are evidence in the case. But here's the thing: None of these jumbled and unsupported allegations are all that relevant, either. That there were "murders and shootings" in the City *before* Harrell took over tells us nothing about whether Harrell did her job and brought those crime figures down. And if—as the City alleges, *see* City's SOF ¶ 13—Harrell *didn't* bring these numbers down, then who can blame the City for firing her? Now, we may agree with Harrell and Mayor Pigatt that she, two months into the job, deserved a longer tenure—that, given the endemic crime problems the City was facing, the Commission could have given her more time to remedy the problem. But we do not "sit as a super-personnel department that reexamines an entity's business decisions." *Denney*, 247 F.3d at 1188 (quoting *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991)). Time and again, in fact, the Eleventh Circuit has reminded us that "[a]n employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc)

---

far too attenuated from Harrell's ultimate termination, which occurred nearly two years *after* the events described in the email.

(cleaned up).

More fundamentally, nothing in this—or, frankly, any other—passage suggests that the City fired Harrell *because* she's a woman. Remember, "[a] reason is not pretext for discrimination 'unless it is shown *both* that the reason was false, *and* that discrimination was the real reason.'" *Brooks*, 446 F.3d at 1163 (quoting *Hicks*, 509 U.S. at 515). Whether the crime numbers went up or down, in other words, Kelley, Burke, and Bass—as we've seen—had *other* reasons for firing Harrell.[14] By Harrell's own account, in fact, Kelley resented her for blowing the whistle on his heavy-handed management style. *See* November 14, 2018 Letter; November 26, 2018 Email. And, while Harrell's original lawsuit had asserted several retaliation claims, *see* Am. Compl. at 14–17, we dismissed those claims when she elected not to respond to the City's Motion for Judgment on the Pleadings, *see* Omnibus Order at 3. Since she never moved to resuscitate those claims, they're no longer a part of our case. Without evidence that "discrimination was the real reason" for her firing, in short, Harrell cannot sustain her pretext contentions.

Harrell also alleges that she "met with Commissioner Kelley and at no time during this meeting did the statements of not being qualified, uptick of crime in the city or complaints from the citizens occur." Harrell's Response at 9. She says similar things about a meeting with Burke, *id.* ("Plaintiff also met with Commissioner Burke . . . . [who] stated to the Plaintiff that he did not have any concerns or problems with her."), and Bass, *id.* at 10 ("Plaintiff met with Commissioner Bass . . . . Commissioner Bass expressed concerns about her vote to terminate the Plaintiff."). For these claims, though, she

---

[14] Again, these *other* reasons included the Commission's view that Harrell wasn't communicating effectively with local stakeholders, that she belittled her staff, that City morale was at an all-time low, and that City employees were afraid of speaking up—in large part because of Harrell's tendency towards retribution. *See, e.g.*, Meeting Video at 1:08:00–1:09:15 (Kelley's statements); *id.* at 1:11:25–1:12:34 (Burke's statements); Bass Decl. ¶ 14. It was Harrell's obligation to rebut each of these legitimate reasons for her termination. *See Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1312 (11th Cir. 2018) (explaining that, "where more than one legitimate reason is given, the plaintiff must rebut each one"). Because she has failed to do that, the City is entitled to summary judgment.

cites only her declaration, which (as we've established) isn't evidence. In any event (again), there's no evidence that the commissioners' unwillingness to air their grievances to Harrell in these private meetings indicates something untoward. The commissioners may well have believed that these public matters were best discussed at a regular meeting of the Commission, or they may have already come to a decision and didn't feel like rehashing it with Harrell, or they may have felt uncomfortable about telling Harrell—face to face—that they would be voting to oust her. Whatever their motivations, of one thing we can be clear: None of these discussions revealed even the slightest hint of sex discrimination. Bass, after all, is herself a woman. *See generally* Meeting Video.

In a strange passage, Harrell also castigates the City because it "cannot and will not produce an affidavit from the former City Attorney Vincent Brown, stating that the reasons for the termination were for the reasons articulated in their motion for summary judgment." Harrell's Response at 10. But Harrell had every opportunity to depose Brown if she'd wanted to. That she chose not to is, of course, her business. But, at this third step of the *McDonnell Douglas* test, it was *her* burden to show that the City's proffered reasons are pretextual. *See, e.g.*, *Earley*, 907 F.2d at 1081 ("To survive summary judgment, the plaintiff must then present concrete evidence in the form of specific facts which show that the defendant's proffered reason is mere pretext. Mere conclusory allegations and assertions will not suffice."). Since Brown's missing testimony isn't evidence of anything, it cannot prop up Harrell's claim.

Next, in a footnote that smacks of the late (great) le Carré, Harrell says this:

Prior to the vote to terminate the Plaintiff, she became aware of a meeting between Commissioners Kelley, Burke and Bass at Commissioner's Kelley's church. Plaintiff listed Calvin Russell as a witness who overheard the conversation and plan to vote the Plaintiff out during the next meeting. The meeting was a direct violation of Florida's Sunshine Law.

Harrell's Response at 10 n.4 (errors in original). It was at this secret meeting, Harrell later says, that the commissioners' avowed reasons for firing her "were all created[.]" *Id.* at 11. For this conspiracy

theory, again, Harrell cites *nothing at all*. And, while she claims that a Mr. Russell might've been a witness to this ecclesiastical cabal, she (for reasons all her own) elected *not* to depose him. In any event, Harrell's claim would fail *even if* she had some evidence of this conspiracy. That's because nothing in this footnote suggests that the conspiracy centered around Harrell's sex. *See Cooper v. Jefferson Cnty. Coroner & Med. Exam'r Off.*, 861 F. App'x 753, 754 (11th Cir. 2021) (affirming summary judgment on the plaintiff's mixed-motive claims because "Cooper did not introduce any evidence of race- or national origin-based conduct"). And, since it's undisputed that Bass is also a woman, any such claim would have been (in a word) implausible. *See Shenzhen Kinwong Elec. Co. v. Kukreja*, 2021 WL 5834244, at *19 n.21 (S.D. Fla. Dec. 9, 2021) (Altman, J.) ("[T]o survive summary judgment, the non-movant must do more than simply show that there is some metaphysical doubt as to the material facts. It must come forward with some affirmative evidence to support its claim." (cleaned up)).

Finally, Harrell concludes by alleging that "City attorney Brown was copied all complaints by the Plaintiff regarding the discriminatory behavior of Commissioner Kelly. *See Exhibits 1, 2, and 3*." Harrell's Response at 10 (errors in original); *see also id.* at 9 ("The Plaintiff complained to the City Attorney and the current mayor regarding the harassing treatment she was enduring from Commissioner Kelley. *See Exhibit 1, 2 and 3*."). Here, Harrell does cite some evidence, and she does mention discrimination. The problem, of course, is that the three exhibits she cites—Exhibits 1, 2, and 3—don't actually support her claim. As we've explained, Exhibit 1—the January 12, 2017 Email—was written two years *before* Harrell was fired and doesn't present any evidence (let alone "concrete evidence," *Earley*, 907 F.2d at 1081) of sex discrimination. Exhibit 2—the November 14, 2018 Letter—avers *only* that some mystery commissioner (1) "required Staff to perform tasks for private citizens during their City work day"; (2) "used [his] position to directly influence and interfere with personnel decisions that are reserved for the Manager, namely the reinstatement of terminated personnel"; and (3) "used [his] position and influence to create a working environment not conducive

to productivity because of their direct ridicule and criticism towards City Staff." Harrell's November 14, 2018 Letter. But it doesn't allege any kind of sex discrimination. And Exhibit 3—the November 26, 2018 Email—simply identifies Kelley as the mystery commissioner Harrell was complaining about in the November 14, 2018 Letter.

Harrell, in short, has failed to meet her burden under *McDonnell Douglas*.

### b. Mixed-Motive

Harrell's mixed-motive claim fares no better. In *Quigg*, the Eleventh Circuit held that "the proper framework for examining mixed-motive claims based on circumstantial evidence is the approach adopted by the Sixth Circuit in *White v. Baxter Healthcare Corp.*, 533 F.3d 381 (6th Cir. 2008)— *not the McDonnell Douglas framework*." *Quigg*, 814 F.3d at 1232 (emphasis added). Under this mixed-motive framework, "to survive a defendant's motion for summary judgment, a plaintiff asserting a mixed-motive claim need only produce evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; and (2) a protected characteristic was a motivating factor for the defendant's adverse employment action." *Id.* at 1232–33 (cleaned up). "An employee challenging a decision made by a board can succeed on a mixed-motive claim if she demonstrates that discriminatory input, such as sex or gender-based bias, factored into the board's decisional process." *Id.* at 1241 (cleaned up). "When an employee raising a mixed-motive claim relies solely on remarks that indirectly evidence discrimination, the employee must show the circumstances surrounding the remarks create a genuine issue of material fact that the employer actually relied on her sex or gender in making its decision." *Id.* (cleaned up).

Harrell hasn't come close to meeting this standard. To the contrary, the record is pellucid that Kelley, Burke, and Bass voted to terminate her for "a slew of other reasons[.]" *Vaughn v. Ret. Sys. of Ala.*, 856 F. App'x 787, 790 (11th Cir. 2021) (rejecting a mixed-motive claim because "[t]he record cannot support [a] finding that Vaughn's gender was at all considered by the powers that be when

they terminated her employment"). Kelley, as we've seen, provided a detailed account of Harrell's failings as City Manager, and both he and Burke outlined their view that "morale [was at an] all-time low"—in part because "staff [was] fearful to even talk in fear of retribution." City's SOF ¶¶ 9–15 (citing the Meeting Video at 1:05:00–1:12:30). In his declaration, Kelley added: "Harrell exhibited subpar communications skills. On multiple occasions, I learned about City events, Saturday workshops, and City business from residents. I believed it was imperative that a City Manager, such as Harrell, effectively communicate with the City commission regarding these matters." Kelley Decl. ¶ 11. And Bass (herself a woman) averred that "Harrell's negativity regarding the City and the state oversight board formed the basis for my decision to vote to terminate Harrell's employment." Bass Decl. ¶ 14. In discussing Harrell's deficiencies, in short, none of these commissioners ever mentioned (or even so much as hinted at) Harrell's sex.

Trying to establish a discriminatory motive, Harrell advances two arguments—both unavailing.

*First*, she claims that "[t]he differences in the provided declarations between the parties create a genuine issue of facts and a jury should be allowed to determine who is telling the true about the reason for the termination." Harrell's Response at 11 (errors in original). Although she doesn't tell us what these "differences" are, she does say—a paragraph or so down—that, according to her declaration, "Commissioner Kelley stated in several meetings, 'he did not want to work with her'; 'he preferred to work with a male city manager'; 'he wanted city manager Daughtrey back in the position' and other comments." Harrell's Response at 11. Two problems with this. *One*, the only "evidence" Harrell gives us for these salacious statements is her own unsigned and undated declaration—which isn't evidence. *Two*, even if the declaration *were* evidence, Harrell never tells us *when* these comments were made. She thus fails to tie these discriminatory remarks to her termination—as the law unambiguously required her to do. *See, e.g., Robertson v. Riverstone Cmtys., LLC*, 849 F. App'x 795, 802,

807 (11th Cir. 2021) (affirming district court's order granting summary judgment on plaintiff-employee's circumstantial-evidence claim because the employer's "racist and abhorrent" remarks "occurred outside the context of and well before the decision to fire" the plaintiff-employee); *Williams v. Hous. Opportunities for Pers. with Exceptionalities*, 777 F. App'x 451, 452, 455 (11th Cir. 2019) (finding no actionable circumstantial evidence of discrimination—even though the defendant-employer told the plaintiff-employee: "I can't stand your black ass"—because the racist statement's "content bears no relation to the termination decision").

*Second*, she complains: "Not one document has been provided by the Defendant prior to the Commissioner's meeting on December 12, 2018 that shows the concerns found in their declarations were told or given to the Plaintiff before she was terminated. At no time during the meetings between the Plaintiff and Commissioner Kelley, Burke, or Bass were these issues discussed. They were all created at the meeting at the church." *Id.* (errors in original). Three problems here. *One*, Harrell cites *nothing*—not even her own declaration—for these propositions. *Two*, even if she had cited something, Harrell never explains why any of this matters. Again, we know of no law that would require an employer, armed with cause to fire an employee, to warn that employee first—and Harrell never suggests that any such law exists. Now, we may be persuaded that an employer would do well, in certain circumstances, to warn first and fire later, but "[w]e are not in the business of adjudging whether employment decisions are prudent or fair." *Damon*, 196 F.3d at 1361; *see also Alphin v. Sears, Roebuck & Co.*, 940 F.2d 1497, 1501 (11th Cir. 1991) ("We also stress that we do 'not sit as a super-personnel department that reexamines an entity's business decisions.'" (quoting *Dale v. Chi. Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986))). *Three*, nothing in these sentences suggests that the Commission fired Harrell *because* she's a woman.

Harrell, in short, cannot sustain a mixed-motive claim of sex discrimination.

CONCLUSION

After careful review, we hereby **ORDER AND ADJUDGE** as follows:

1.  The City's Motion for Summary Judgment [ECF No. 46] is **GRANTED**.

2.  Pursuant to FED. R. CIV. P. 58, we'll enter final judgment separately.

3.  The Clerk of Court shall **CLOSE** this case.

4.  All other pending motions are **DENIED** as moot, all other deadlines are **TERMINATED**, and any remaining hearings are **CANCELED**.

**DONE AND ORDERED** in the Southern District of Florida, this 28th day of March 2022.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:    counsel of record